UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- x

ROBYN FENTY and TOURIHANNA LLC,  :

                           Plaintiffs,  :

        -against-  :

BERDON, LLP, MICHAEL MITNICK and  :
PETER GOUNIS,  :

                     Defendants.  :

------------------------------------------------------- x

Case No.:  12-cv-5207 (PKC) (MHD)

**<u>COMPLAINT</u>**

**(JURY TRIAL DEMANDED)**

Cindy Schmitt Minniti (CS6626)
Meagan E. Crowley (MC5036)
Reed Smith LLP
599 Lexington Avenue
New York, NY 10022
Tel:  (212) 521-5400
Fax:  (212) 521-5400
cminniti@reedsmith.com

Miles M. Cooley (*pro hac vice pending*)
Stuart A. Shanus (*pro hac vice pending*)
Reed Smith LLP
1901 Avenue of the Stars, Suite 700
Los Angeles, CA 90067
Tel:  (310) 734-5256
Fax:  (310) 734-5299

*Attorneys for Plaintiffs*

Plaintiffs Robyn Fenty ("Fenty") and Tourihanna LLC ("Tourihanna") complain of defendants Berdon, LLP ("Berdon"), Michael Mitnick ("Mitnick") and Peter Gounis ("Gounis") (hereinafter collectively referred to as "Defendants"), and alleges as follows:

## PARTIES

1.      Plaintiff Fenty is a top R&B recording artist and one of the best selling recording artists of all time, with six chart-topping albums and multiple national and international number-one hit singles.  Fenty was born in Saint Michael, Barbados into the modest home of an accountant and a warehouse supervisor.  She began singing as a child and decided to leave high school early to pursue her music career exclusively.  In 2005, at the age of sixteen, Fenty was discovered and signed with Island Def Jam Music Group.  She subsequently moved to the United States to pursue her music career.

2.      Over the last seven years, Fenty has become an internationally-acclaimed musician and entertainer.  She has achieved a total of eleven number one singles on the *Billboard* Hot 100 chart, becoming the youngest solo artist to achieve the feat.  *Billboard* named Fenty the Digital Songs Artist of the 2000s decade, and ranked her as the seventeenth artist of the same decade.  She is the highest-selling digital artist in US history, having sold 47,571,000 singles as of 2012.  Some of her singles have earned their place on the list of best-selling singles worldwide.  All told, since 2005, Fenty has sold more than 25 million albums and 60 million singles worldwide.  Also in that time, Fenty has won nearly two hundred awards for her work, including five Grammy Awards, five American Music awards, eighteen *Billboard* Music Awards, three BET Awards and two Brit Awards.  In 2007, Fenty won the World Music Award for World's Best-Selling Pop Female Artist and Female Entertainer of the Year.  Since 2007, Fenty also has received endorsements from several high profile companies, including Secret,

Cover Girl, Giorgio Armani, Gillette, Gucci, Nokia, Doritos, Totes-Isotoner, Vita Coco and Optus Funds.

3.      In 2005, as a minor with a booming music career and no knowledge or understanding of financial matters whatsoever, on her behalf, Fenty's management introduced her to defendant Berdon for the purpose of Berdon providing accounting and business management services, including the management of her and her corporate entities' finances, and the provision of advice regarding business and investment decisions.  Berdon, in turn, assigned defendants Mitnick and Gounis, among other Berdon employees, to work on Fenty's accounts and those of corporate entities they would establish for various aspects of Fenty's business activities.  Fenty relied on Defendants exclusively to provide her and her corporate entities – eventually including Tourihanna – with accounting and business management services.

4.      Tourihanna was established by Berdon in 2005 on Fenty's behalf as her concert touring company.  Between 2005 and 2010, Tourihanna was the company through which Fenty's concert tours were run, including her 2009 "Last Girl on Earth" tour.  Between 2005 and 2010, Tourihanna suffered significant financial losses due to Defendants' financial mismanagement and other acts and omissions, as set forth herein.

5.      Plaintiffs are informed and believe, and on that basis allege, that at all relevant times, Berdon was and is an accounting and business management firm offering, among other services, certified public accounting, taxation, personal business management, advisory, due diligence, internal controls, risk management and business and personal wealth consulting services.  Plaintiffs are further informed and believe, and on that basis allege, that Berdon advertises itself as an accounting firm which provides services to help its business and entertainment clients to "minimize taxes, maximize profits, grow their businesses, enhance their

net-worth [and] preserve and transfer wealth."  Berdon boasts an Entertainment and Personal

Business Management Group ("Entertainment Group") which purports to assist entertainers,

specifically by developing personal, business and tour budgets and comparing and analyzing

those budgets against actual expenses, providing tour accounting, overseeing exchanges of funds,

minimizing tax burdens and maximizing tax advantages, reviewing corporate structures,

assessing insurance needs to determine the most effective insurance plan and devising trust

plans.  Berdon's Entertainment Group also purports to perform analyses of royalty agreements

and statements to ensure receipt of maximum payments.

       6.     In 2005, when Fenty was 16 years old, Berdon was hired to provide her with

accounting, business and financial management services for all aspects of her rapidly growing

music career.  Because she was a minor with no knowledge of the music industry or financial

matters generally, Fenty placed Berdon in a position of trust and loyalty with respect to

management of her finances and those of her corporate entities, including Tourihanna.  As a

result, Plaintiffs were dependent upon, and vulnerable to, the actions of Berdon in connection

with their finances.  Even after reaching the age of majority, Fenty continued to hold Berdon in a

position of trust and loyalty with respect to management of her career and finances and, as a

result, Fenty remained dependent upon, and vulnerable to, the actions of Berdon in connection

with her career and finances.  Because Berdon performed all of the accounting and business

management related-services for Tourihanna, Tourihanna also was dependent upon and

vulnerable to Berdon's misconduct and malfeasance.

       7.     Defendant Mitnick is, on information and belief, a Certified Public Accountant.

Plaintiffs are informed and believe, and on that basis allege, that at all times relevant to this

action, Mitnick was and is a member of Berdon, leading Berdon's Entertainment Group.

Plaintiffs are further informed and believe that Mitnick holds himself out as having particular expertise in royalty accounting for individuals in the entertainment and recording industries including, but no limited to, investigation of royalty disputes, analysis of statements and payments and verification of payment accuracy.  In 2005, when Fenty was only 16 years old, Berdon was hired to provide her with accounting and business and financial management services for all aspects of her music career.  As a "partner" at Berdon, Mitnick was assigned to, and supervised, Fenty's accounts at all relevant times.  Because she was a minor with no knowledge of the music industry or financial matters generally, Fenty placed Mitnick in a position of trust and loyalty with respect to management of her finances and those of her corporate entities, including Tourihanna.  As a result, Plaintiffs were dependent upon, and vulnerable to, the actions of Mitnick in connection with their finances.  Even after reaching the age of majority, Fenty continued to hold Mitnick in a position of trust and loyalty with respect to management of her finances and those of her corporate entities, including Tourihanna.  As a result, Plaintiffs remained dependent upon, and vulnerable to, the actions of Mitnick in connection with their finances.

8.     Defendant is, on information and belief, a certified public accountant employed by Berdon at all relevant times herein.  As a Berdon employee, Gounis was assigned to, and worked on, Fenty's accounts at all times relevant to this action.  Because Fenty was a minor with no knowledge of the music industry or financial matters, generally, Fenty placed Gounis in a position of trust and loyalty with respect to management of her finances and those of her corporate entities, including Tourihanna.  As a result, Plaintiffs were dependent upon, and vulnerable to, the actions of Gounis in connection with their finances.  Even after reaching the age of majority, Fenty continued to hold Gounis in a position of trust and loyalty with respect to

management of her finances and those of her corporate entities, including Tourihanna.  As a result, Plaintiffs remained dependent upon, and vulnerable to, the actions of Gounis in connection with their finances.

9.      Plaintiffs are informed and believe, and on that basis allege, that each of the Defendants is and was at all relevant times, the agent, representative and/or employee of one another, and was acting within the course and scope of said agency, representation and/or employment and with the knowledge and consent of the remaining Defendants.

## JURISDICTION AND VENUE

10.      This Court has jurisdiction of the subject matter of this action pursuant to 28 U.S.C. § 1332 based on the diversity of the parties' citizenship and because the amount in controversy exceeds $75,000, exclusive of interest and costs.  Fenty is a citizen of the sovereign country of Barbados and a resident alien domiciled in the State of California.  Fenty is the sole member of Tourihanna, a limited liability company.  Berdon is a limited liability partnership whose members each are, upon information and belief, citizens of the States of New York and Florida and are not citizens of the State of California or the country of Barbados.  Mitnick is, upon information and belief, a United States citizen and a resident of the State of Florida.  Gounis is, upon information and belief, a United States citizen and a resident of the State of New Jersey.

11.      Venue is proper pursuant to 28 U.S.C. §1391(a) in that a substantial part of the events, acts and omissions giving rise to the claims occurred within this judicial district and because all Defendants have transacted and presently transact their affairs in this judicial district.

12.      This Court has personal jurisdiction over Defendants because, at all relevant times mentioned herein, Defendants did and continue to do business in this judicial district related to

their provision of accounting and business management services to Plaintiffs, and in so doing, maintained substantial, continuous and systematic contacts with, including physical presence in, this judicial district.

## ALLEGATIONS COMMON TO ALL CLAIMS

**A.**      **Fenty Launches Her Music Career in 2005**

13.      Since 2005, Fenty has recorded and released six hit albums. In 2005, she released her debut album, "Music of the Sun", which launched into the top ten of the *Billboard* 200 chart and featured Plaintiff's first *Billboard* Hit 100 single. She released her second album, "A Girl Like Me," in 2006 and earned a place in the top five of the *Billboard* albums chart and produced her first Hot 100 number one single, "SOS." In 2007, Fenty recorded her third album, "Good Girl Gone Bad," which included eight hit singles and four chart-topping singles including, "Umbrella," "Take a Bow," "Disturbia," and "Don't Stop the Music." That same year, Fenty was nominated for nine Grammy Awards, winning Best Rap/Song Collaboration for "Umbrella" featuring Jay-Z. In 2009, she released her fourth album, "Rated R", which debuted at number four on the *Billboard* 200 and has been certified platinum by the Recording Industry Association of America. "Rated R" produced ten hit singles, including "Russian Roulette," "Hard" and "Rude Boy," each of which achieved the number-one spot on the *Billboard* Hot 100. In 2010, Fenty released her fifth album, "Loud", which included three number one hits – "Only Girl (In the World)," "What's My Name?" and "S&M." In 2011, Fenty's sixth studio release, "Talk that Talk" was released. Three singles from this album, "We Found Love", "You Da One" and "Talk that Talk", were all international success, topping the charts in numerous countries. In June 2011, Fenty embarked on the highly successful and profitable worldwide "Loud" tour, during which she sold out ten nights at the O2 Arena in London, the most sold out shows for a female

artist in the venue's history.

14.     Fenty began to build her music career upon moving to the United States at the age of 16 from her native Barbados.  As a minor with no knowledge of the music industry or financial matters, generally, she relied upon Defendants exclusively to ensure proper accounting of her finances and provide her with business and financial management advice.  As a result, Fenty placed Defendants in a position of trust and loyalty and, as a result, she was dependent upon and highly vulnerable to the actions of Defendants.

**B.     Fenty's Relationship With Defendants and Defendants' Agreements to Provide Accounting, Business Management and Financial Advisory Services**

15.     Beginning in April 2005, Fenty engaged Defendants to provide her with professional accounting services pursuant to a written engagement letter dated April 8, 2005 ("2005 Engagement Agreement").  Under the 2005 Engagement Agreement, Defendants agreed they would, among other services, provide Fenty, with business management and accounting services, including preparation and supervision of specialized accounting services related to the music business, such as royalty analysis.  Under the 2005 Engagement Agreement, Fenty's specific authorization was required for payment of certain bills.  The 2005 Engagement Agreement further stated Defendants would review investment opportunities at Fenty's request and advise her of their economic implications and income potential.

16.     Fenty and Defendants entered into a similar written engagement agreement on March 13, 2007 ("2007 Engagement Agreement") pursuant to which Defendants agreed they would continue to provide her with accounting and business management services.  According to the 2007 Engagement Agreement, Defendants agreed, among other things, to maintain all necessary books and records for certain accounts and to assist Fenty, upon her request, in securing mortgages, insurance and leases.

17.     On March 20, 2009, Fenty and Defendants entered into a third written engagement agreement ("2009 Engagement Agreement").  Pursuant to the 2009 Engagement Agreement, Defendants agreed they would, among other services, provide Fenty with a summary analysis of her investments and other assets upon request and would, upon her request, assist her in securing mortgages, insurance and leases.  Also under the 2009 Engagement Agreement, Defendants agreed to review investment opportunities and advise Fenty of their economic and tax implications and income potential.  Defendants further agreed, upon request, to invest excess funds in short term securities to maximize Fenty's return on her funds.

18.     On February 1, 2010, Fenty entered into a fourth written engagement agreement with Berdon, pursuant to which Defendants agreed they would provide certified public accounting and other services ("2010 Engagement Agreement" and, together with the 2005 Engagement Agreement, 2007 Engagement Agreement, and 2009 Engagement Agreement, "Engagement Agreements").  In the 2010 Engagement Agreement, Defendants again agreed, among other things, to review investment opportunities upon Fenty's request, to advise her of their economic and tax implications and income potential and to invest excess funds in short term securities to maximize Fenty's return on her funds.

19.     Under the Engagement Agreements, Defendants earned "commissions" based on a percentage of Fenty's gross receipts.  Plaintiffs are informed and believe, and on that basis allege, that this type of arrangement was not standard for the accounting and business management industry, and that Defendants' "commissions" were exorbitant and excessive.  Plaintiffs are further informed and believe, and on that basis allege, that this financial arrangement motivated Defendants to conceal material facts regarding Plaintiffs' finances from them, in that, had they known the true facts regarding Defendants' negligence and wrongful

conduct, as alleged herein, Plaintiffs would have terminated Defendants, thereby depriving

Defendants of their "commissions."  Moreover, Defendants drafted the Engagement Agreements

without negotiation or review of their terms, including terms governing compensation, by

independent financial and legal professionals chosen by Fenty.

20.     Plaintiffs are informed and believes, and on that basis alleges, that from 2005

through 2010, Defendants assumed business management, accounting and advisory roles well

beyond the services provided for in the written Engagement Agreements and, in providing their

services to Plaintiffs, exerted substantial control over Plaintiffs' financial affairs.

21.     Plaintiffs are informed and believe, and on that basis allege, that in providing

these services to Plaintiffs, Defendants failed to follow applicable industry standard accounting

and business management practices, as alleged herein.  In particular, Plaintiffs are informed and

believe, and on that basis allege, that, among other omissions and failures, Defendants'

recordkeeping and accounting methods failed to provide sufficient information and/or detail

regarding, and/or failed entirely to account for, Plaintiffs' revenue and expenses and failed to

ensure maximization of Plaintiffs' revenue and Fenty's personal net worth and long term wealth.

**C.**     **Defendants' Gross Mismanagement Of Plaintiffs' Cash Flow, Expenses, Touring Income, and Failure to Properly Report to Plaintiffs**

22.     On information and belief, Defendants failed to properly manage Fenty's cash

flow and expenses.  For example, Defendants formed various limited liability companies to

manage Fenty's cash flow and expenses.  Plaintiffs are informed and believe, and on that basis

allege, that Defendants formed these business entities, including Tourihanna, without proper

consideration of tax consequences, resulting in substantial unnecessary losses to Fenty.  Plaintiffs

are further informed and believe, and on that basis allege, that under Defendants' direction, these

companies made frequent inter-company loans to pay Fenty's expenses without proper

accounting.

23.     Defendants also failed to implement sufficient mechanisms to obtain Fenty's

approval of standard or non-standard expenses on a regular basis, as required by accounting and

business management industry standards.  Defendants further failed to create and implement

sufficient financial and cash management controls for Plaintiffs, which are standard in the

industry.  In particular, Defendants failed to ensure a proper budget was created for the "Last

Girl on Earth" tour, failed to sufficiently monitor or minimize Tourihanna's expenses during the

tour, failed to report to Plaintiffs regarding Tourihanna's revenue versus expenses, and failed to

reconcile tour expenses and generally put Tourihanna's books in order upon the tour's

completion.  As a result of Defendants' gross mismanagement, Plaintiffs lost millions of dollars

on the "Last Girl on Earth" tour.  Astonishingly, however, due to its improper financial

arrangement with Fenty, Berdon paid itself millions of dollars in commissions for the "Last Girl

on Earth" tour based on Fenty's gross receipts from the tour.  Plaintiffs are informed and believe,

and on that basis allege, that Berdon's receipt of commissions measured as a percentage of

Fenty's gross receipts created a conflict of interest, in that Berdon had no incentive to counsel

Plaintiffs to reduce expenses, implement sufficient and appropriate financial controls, or consider

net receipts, because Berdon would be paid based upon gross receipts, regardless of expenses or

net receipts.  Plaintiffs are further informed and believe, and on that basis allege, that Berdon

was further motivated to conceal from Plaintiffs the true state of their finances and Berdon's

mishandling of their accounts in order to ensure Berdon's continued receipt of commissions

from, and employment by, Plaintiffs.

24.     Plaintiffs are informed and believe, and on that basis allege, that Defendants failed

to conduct thorough monthly planning, tracking or record-keeping with respect to Fenty's

personal expenses and her business enterprises, including Tourihanna, and failed to sufficiently discuss expenses with Fenty, as required by accounting and business management industry standards.  Nor did Defendants consistently prepare written monthly budgets for Fenty personally or for her business enterprises, including Tourihanna.  On information and belief, from 2007 through August 2010, Defendants failed to maintain a proper set of detailed accounting records for Fenty, personally, and for each business entity, including Tourihanna. Moreover, Defendants failed to maintain any electronic records in connection with Fenty's accounts, instead compiling incomplete and incoherent paper records.  In fact, Defendants' files reflect that less than twenty-five percent (25%) of expenses charged to Fenty's personal credit card were actually retained.  During 2008 and 2009, alone, Defendants retained only two to four percent (2% to 4%) of all receipts for expenses charged to Fenty's credit card.

25.     In addition, on information and belief, Defendants paid millions of dollars in commissions to third-parties without any written representation agreements and with only limited approvals from Fenty authorizing a fraction of such payments.  From January 2007 through September 2010, Defendants also authorized hundreds of thousands of dollars in reimbursements for stated third-party expenses without any supporting documentation or any written agreement regarding reimbursement.

26.     During the time period in which Defendants provided Fenty with business management, accounting and advisory services from 2005 through 2010, Defendants failed to sufficiently and consistently report to Fenty the current state of her finances pursuant to industry standards.  In particular, Defendants failed to prepare and provide Fenty with monthly detailed reports of cash receipts and disbursements, personal financial statements or statement of net worth, revenue and expense for Fenty, personally.  Defendants further failed to prepare and

provide to Fenty monthly comprehensive financial statements, including balance sheets,

statement of operations and statements of cash flows for each of Fenty's business entities,

including Tourihanna.  In addition, Plaintiffs are informed and believe, and on that basis allege,

that Defendants failed entirely to create or implement any long term strategic plan for

preservation of Fenty's wealth.  Furthermore, Plaintiffs allege on information and belief that

Berdon intentionally concealed the true state of their overall finances in order to ensure Berdon's

continued employment by them and continued its receipt of exorbitant commissions pursuant to

their improper and non-industry standard financial arrangement with Fenty.

27.      Indeed, with the exception of providing Fenty with a single personal financial

statement for the first quarter of 2005, Defendants failed to report information to Fenty in any

consistent or meaningful manner as required by accounting and business management industry

standards.  On information and belief, Defendants' files related to Fenty's accounts, including

that for Tourihanna, contain only a fraction, if any, of the accountings, reports or approvals

which are standard in the accounting and/or business management industries and these omissions

fall well below the applicable standards of care.

**D.**      **Defendants' Mismanagement of Taxes**

28.      Plaintiffs are informed and believe, and on that basis allege, that Defendants

mishandled Fenty's foreign and domestic tax withholdings and payments by, among other things,

withholding more taxes than necessary, leading to significant losses of tax benefits and/or

savings, and failed entirely to file tax returns in certain instances, causing assessment of late-

filing penalties against Fenty.

29.      Plaintiffs are informed and believe, and on that basis allege, that Defendants'

mismanagement of Fenty's tax withholdings has resulted in the creation of excess foreign tax

credits.  On information and belief, as a further result of Defendants' poor tax planning, there are now tens of thousands of dollars worth of unused foreign taxes withheld and it is unclear if, when or how these credits, which expire within a set time period in the future, can be used.

30.     On information and belief, Defendants failed to obtain a tax refund in connection with value added taxes ("VAT") withheld during Plaintiffs' European tours and in connection with merchandise sales on their international tours.  On information and belief, Defendants also failed to claim tens of thousands of dollars of foreign tax credits withheld in connection with merchandising income for the 2008 tax year.  On information and belief, obtaining VAT and other types of foreign tax refunds is standard in the accounting and/or business management industries and these omissions fall below the applicable standards of care.

31.     Plaintiffs are informed and believe, and on that basis allege, that during 2009, Fenty had negative taxable income, yet Defendants failed to carry back the loss to prior years in order to obtain a refund for many thousands of dollars.

32.     Certain of Fenty's tax returns are currently the subject of an audit by the Internal Revenue Service ("IRS").  Plaintiffs are informed and believe, and on that basis allege, that the IRS audit is a direct result of Defendants' negligence in connection with the filing her tax returns between 2008 and 2010.  As a result of this audit, Fenty has been required to spend significant resources to correct Defendants' negligence and interface and resolve the audits with the IRS.

**E.     Defendants' Mismanagement of Fenty's Royalty and Endorsement Receipts**

33.     Plaintiffs are informed and believe, and on that basis allege, that Defendants also made numerous errors in accounting for royalties owed to Fenty, including, but not limited to, Defendants' failure to uncover millions of dollars in unpaid royalties.

34.     Defendants' audits of Fenty's royalty accounts failed to uncover numerous

problems with the manner in which UMG Recordings, Inc. ("UMG") was keeping track of

Fenty's royalties.  Defendants' audit reports did not reference any "open items" with UMG,

despite the fact that, on information and belief, it would be highly unusual for there to be no

items which UMG did not provide.  On information and belief, Defendants' failure to address

"open items" precluded Fenty from being able to ascertain what, if any, additional amounts were

due and owing to her.

35.     Defendants' audit reports failed to indicate the source of certain income or any

efforts by Defendants to ascertain where income was derived from (i.e. legal settlements, signing

bonuses, advances, free goods, license agreements, etc.) in order to ensure proper distribution of

amounts.

36.     Plaintiffs are informed and believe, and on that basis allege, that once Defendants'

audit reports were submitted to UMG, Fenty's opportunity to capture these potential sources of

royalty income was foreclosed.

37.     Defendants' audit reports did not make any findings or mention of follow up with

UMG regarding claims relating to Foreign TV Advertising Costs, although the royalty

statements reflected millions of dollars deducted in the marketing section of those statements.

38.     On information and belief, the claims set forth in Defendants' audit report lacked

sufficient detail to ensure accurate payments by UMG and/or were calculated incorrectly.

39.     Plaintiffs are informed and believe, and on that basis allege, that Defendants also

failed to properly track endorsement payments due and/or provide Fenty with periodic reports

regarding the same.

40.     On information and belief, Defendants' failures and omissions with respect to

Fenty's royalty audits and endorsement payments fall well below the applicable standards of care

in the accounting and/or business management industries.

F.    **Defendants' Negligence With Respect to Fenty's Purchase of the Beverly Hills Home in 2009**

41.    In the Fall of 2009, when Fenty was on the "Last Girl on Earth" tour, she sought to purchase a home.  Despite the fact that Tourihanna was suffering significant net losses the "Last Girl on Earth" tour, Defendants failed to counsel or advise Fenty of this fact and its effect on her finances or the fact that it was not advisable for her to purchase the property she sought to buy at that time due to these losses.  On information and belief, in factDefendants hid this information from Plaintiffs.  Instead, Defendants gave Fenty a budget to purchase a new home in an amount which, unbeknownst to Fenty, was inadvisable at that time, due to the then hidden losses occasioned by Defendants' mismanagement.  Plaintiffs are further informed and believe, and on that basis allege, that Defendants failed to substantively participate in the negotiations or due diligence related to the purchase of the Property.  As a result of Defendants' acts and omissions, Fenty purchased a home, even though it was inadvisable to do so and competent business managers would have advised her not to do so.

G.    **Defendants' Understaffing of Fenty's Accounts and Earning Excessive Commissions For Their Services**

42.    Plaintiffs are informed and believe, and on that basis allege, that throughout the five-year period during which Berdon provided them with business management, accounting and advisory services, Mitnick, Gounis and two other Berdon employees were the only Berdon employees assigned to Fenty's accounts.  On information and belief, Defendants failed to properly staff Fenty's accounts with sufficient personnel having the requisite music industry expertise, including a failure by Defendants to ensure proper supervision of more junior employees working on Fenty's accounts and failure to add more staff to these accounts as her career grew.

43.     From January 2007 through September 2010, when Berdon was terminated, Berdon earned millions of dollars in commissions on Fenty's gross receipts in an amount constituting approximately twenty-three (23%) of Fenty's net income during that period. Plaintiffs are informed and believe, and on that basis allege, that Berdon's receipt of commissions calculated as a percentage of Fenty's gross receipts was not standard in the accounting and business management industry and created a clear conflict of interest, in that Berdon was not motivated to counsel Plaintiffs to reduce expenses, or to implement standard financial controls and budgeting standard in the industry.  Plaintiffs further allege, on information and belief, that Berdon had incentive to conceal material information from them regarding their finances in order to ensure Berdon's continued employment by Plaintiffs and their continued receipt of excessive and improper commissions.

44.     Plaintiffs are informed and believe, and on that basis allege, that of the millions of dollars in excessive commissions earned by Berdon from 2005 through September 2010, Berdon provided time sheets for only seventeen percent (17%) of the time billed for work done on Fenty's accounts.  Indeed, nearly seventy-five percent (75%) of the invoices Fenty received from Berdon contained little or no explanation or description of the work done by Berdon's employees, despite the fact that some employees purported to spend anywhere from two to ten hours per day working on Fenty's accounts.

45.     Plaintiffs are informed and believe, and on that basis allege, that from January 2007 through September 2010, in connection with Plaintiffs' tours and pursuant to Berdon's improper financial arrangement with Fenty, Defendants earned millions of dollars in commissions on tour gross receipts from Tourihanna's revenues in an amount equaling nearly twenty-three percent (23%) of total tour income.  Fenty's total income from touring during this

period, on the other hand, paled in comparison, constituting only six percent (6%) of total tour income.  Berdon's receipt of commissions based on a percentage of gross tour income created a conflict of interest in that Berdon had no incentive to counsel Plaintiffs to reduce expenses or to put in place appropriate financial controls, and offered no such counsel or put in place no such controls, because expenses did not impact Berdon's hefty and undeserved compensation in any way.

46.    Plaintiffs are informed and believe, and on that basis allege, that the exorbitant commissions taken by Berdon, aside from being obtained despite the clear conflict of interest created by Berdon's financial arrangement with Fenty, were unwarranted given Defendants' serious professional lapses in performing their business management, accounting and advisory services to Fenty and her companies, including Tourihanna, as alleged herein.

**H.    Fenty Suffers Losses and Pays Excessive Commissions Over a Six-Year Period**

47.    In connection with each album released from 2005 through September 2010, Plaintiffs embarked on four national and international tours under Defendants' financial management.  In 2006, Plaintiffs completed Fenty's first headlining tour, Rihanna:  Live in Concert.  As Fenty's first tour, the "Rihanna:  Live in Concert" tour suffered a net loss.  In 2007, Plaintiffs embarked on the "Good Girl Gone Bad" tour, which resulted in a net gain equaling twenty-two percent (22%) of the total revenues for the tour.  On information and belief, during the "Good Girl Gone Bad" tour, the commissions Fenty paid to Defendants accounted for more than six percent (6%) of tour expenses, excluding management commissions.  In 2009, Plaintiffs began the "Last Girl on Earth" tour.  Despite large revenues, the "Last Girl on Earth" tour suffered significant net losses.  On information and belief, these losses were due to exorbitant tour expenses during the tour which Defendants failed to manage, budget, monitor or otherwise

control and/or Defendants' failure to put appropriate, industry standard financial and budgeting controls in place. Plaintiffs are informed and believe, and on that basis allege, that Defendants' failure to monitor and control expenses was a result of the improper financial arrangement and conflict of interest between Berdon and Fenty, pursuant to which Berdon earned commissions based on a percentage of Fenty's gross receipts, without regard for expenses or net receipts. In addition, a large percentage of the "Last Girl on Earth" tour expenses were comprised of commissions paid to Defendants despite their failure to properly manage the financial aspects of the tour.

48.     Since terminating Defendants in 2010 and hiring new financial managers, Plaintiffs commenced the "Loud" tour in June 2011, which concluded in December 2011. The "Loud" tour was a critical and financial success, resulting in a net profit equal to over forty percent (40%) of total tour revenues.

**M.     Fenty Learns, for the First Time, In September 2010 That She Has Suffered Significant Financial Losses Due to Defendants' Mismanagement and Terminates Them**

49.     In September 2010, despite having earned tens of millions of dollars in revenues during Berdon's tenure, Fenty learned that her net income after payment of expenses and exorbitant commissions to Defendants, as alleged herein, was a fraction of that amount.

50.     Prior to September 2010, since she had been a minor starting out in the entertainment business, Fenty had placed Defendants in a position of trust and loyalty with respect to management of her finances and career and, as a result, relied entirely on Defendants to monitor her finances and career. Plaintiffs are informed and believe, and on that basis allege, that Defendants knew that Fenty relied entirely on Defendants with respect to management of her finances and those of her companies, including Tourihanna. Defendants failed to sufficiently inform Fenty of the myriad problems with, and deficiencies in, their management of her

finances, as set forth herein.  Due to the relationship of trust and loyalty between Fenty and

Defendants, Plaintiff did not question Defendants beyond the minimal amount of information

they gave her regarding the status of her finances and those of her companies, including

Tourihanna.

**FIRST CLAIM FOR RELIEF**
**BREACH OF CONTRACT**
**(Against Berdon, Mitnick and Gounis)**

51.     Plaintiffs incorporate and re-alleges paragraphs 1 through 50, above, as though set

forth in full herein.

52.     Fenty and Berdon entered into written Engagement Agreements, pursuant to

which Defendants would provide business management, accounting and advisory services to

Fenty in connection with her music career and finances.

53.     The Engagement Agreements were modified by the oral agreement of Fenty and

Defendants ("Modified Agreements").  The purpose of the oral agreement was to modify the

Engagement Agreements, and the parties' oral modification of the Engagement Agreements was

confirmed by the conduct of the parties and supported by valuable and new consideration, in that

Defendants provided Fenty with services beyond, and in addition to, those set forth in the

Engagement Agreements and Fenty compensated Defendants for those additional services.

Pursuant to the Modified Agreements, Defendants agreed to provide investment advice and other

advisory services to Fenty and her companies in a reasonably competent manner.

54.     Alternatively, the parties acted pursuant to agreements implied in fact, under

which Fenty compensated Defendants for services beyond, and in addition to, those set forth in

the Engagement Agreements as part of a course of conduct by Fenty and Berdon, or as result of

the personal understanding between Fenty and Berdon, such that Defendants voluntarily

accepted compensation from Fenty with the expectation on both Fenty's and Defendants' parts

– 19 –

that Fenty would receive the benefit of services beyond, and in addition to, those set forth in the Engagement Agreements ("Implied In Fact Agreements").

55.     Fenty has performed all conditions, covenants and promises required to be performed on her part in accordance with the terms and conditions of the Engagement Agreements, the Modified Agreements and the Implied in Fact Agreements, or was excused from performance as a result of Defendants' negligence and fraud as herein alleged.

56.     During the five-year period in which Fenty employed Berdon, Defendants continuously breached the Engagement Agreements, the Modified Agreements and/or the Implied in Fact Agreements up to and including at least September 2010 by, among other things: forming entities to manage Fenty's cash flow and expenses without regard for tax consequences, resulting in unnecessary losses; failing to properly account for, monitor and report the status of the finances of Fenty's entities, including Tourihanna; directing these entities to make inter-company loans to cover expenses without proper accounting; failing to implement sufficient mechanisms for obtaining Fenty's approval of expenses or any large-scale financial controls standard in the industry; failing to ensure creation of a proper budget for Plaintiffs' "Last Girl on Earth" tour, incurring unnecessary tour expenses and failing to properly reconcile tour expenses upon its completion; failing to sufficiently and consistently discuss the state of Fenty's finances or those of her companies, including Tourihanna or advising Fenty as to any long term wealth management planning; failing to properly counsel and advise Fenty against purchasing the Property, which was beyond her means at the time, unbeknownst to Fenty; failing to uncover millions of dollars in unpaid royalties; mishandling Fenty's foreign and domestic tax withholdings and payments, leading to significant losses of tax benefits and/or savings; failing to properly staff Fenty's accounts; and paying itself excessive commissions based on Fenty's gross

revenues despite the clear conflict of interest created by Berdon's financial arrangement with Fenty's, as alleged herein.

57.     Had Fenty known that Defendants had not complied with the Engagement Agreements, the Modified Agreements and the Implied in Fact Agreements, Fenty would not have paid Berdon unearned commissions or incurred unnecessary and exorbitant business and personal expenses.

58.     As a result of Defendants' numerous breaches of the Engagement Agreements, the Modified Agreements and the Implied in Fact Agreements, Fenty paid Berdon millions of dollars in commissions and incurred significant unnecessary business and personal expenses, her damages in a total amount to be proven at trial.

**WHEREFORE**, Plaintiffs pray for judgment as hereafter set forth.

**SECOND CLAIM FOR RELIEF**
**PROFESSIONAL NEGLIGENCE**
**(Against Berdon, Mitnick and Gounis)**

59.     Plaintiffs incorporate and re-allege paragraphs 1 through 58, above, as though set forth in full herein.

60.     As providers of professional accounting and business management services to Plaintiffs, Defendants owed Plaintiffs a duty to use such skill, prudence, and diligence as other members of the accounting and business management professions commonly possess and exercise.

61.     With respect to Plaintiffs' finances generally, accounting and business management industry standards required Defendants to, among other things:  (1) discharge their responsibilities with integrity, objectivity, due professional care and a genuine interest in serving the public; (2) remain free of conflicts of interest; (3) perform their professional services to the best of their ability with concern for the best interest of Plaintiffs and consistent with

– 21 –

Defendants' responsibility to the public; (4) not promote their abilities to provide professional services in a manner that was false, misleading or deceptive; (5) ensure that comprehensive financial planning was formulated, implemented, monitored and revised, including monthly and annual budgeting and longer term wealth planning, especially for Fenty, as an entertainer who might have only enjoyed a limited period of substantial income; (6) ensure a system of internal control procedures was planned, developed and implemented to safeguard Plaintiffs' assets and promote the accuracy and reliability of the financial information being processed and reported, especially with regard to touring business; (7) take primary responsibility for collecting, properly categorizing and analyzing financial information related to Plaintiffs' financial activities, including income received, processing disbursements and reconciling books of account and banking records; (8) timely prepare accurate and meaningful financial reports to Plaintiffs; (9) actively engage in dialogue with Plaintiffs, including written and verbal professional communications, including comprehensive written reports containing financial, accounting and tax related planning and compliance information; and (10) fully explain the financial implications and consequences associated with those reports.

62.     With respect to planning for Plaintiffs' extensive tours, accounting and business management industry standards required Defendants to, among other things:  (1) be actively involved in all components of each tour without simply deferring to tour managers or tour accountants; (2) develop a master plan with regards to budgeting tours; (3) establish spending ceilings and salary structures; (4) obtain detailed deal sheets from tour agents including proposed dates, ticket prices and promoter-proposed expenses; (5) participate in routing decisions; (6) take an active role in defining the size and scope of the proposed production and analysis of projected income and potential results; (7) take an active role in contracting for creative participants (i.e.

director, choreographer, sound design, wardrobe, etc.) and suppliers (i.e. lighting, video, staging, etc.); (8) meet with Plaintiffs to discuss all aspects of the tour and the potential upside or downside of the proposed tour plan; (9) participate in early discussions with tour agents and managers to establish the market demand and define the potential size and scope of the tour; (10) outline tour periods and gather information about potential income; (11) research necessary qualified service providers and other tour experts; (12) conduct internal planning for management, accounting and reporting of the tour and participate in initial conversations with Plaintiffs regarding financial goals; (13) begin the process of building a potential business plan specific to each tour; and (14) conduct a final review and approval with the client of the tour business plan before the show was built.

63.     With respect to active involvement in Plaintiffs' ongoing tours, accounting and business management industry standards required Defendants to, among other things:  (1) conduct weekly reviews of shows, income and expenses from a gross revenue perspective; (2) conduct weekly reviews of petty cash, credit card activity, hotel settlements, vendor payments and the cash position of the tour; (3) conduct regular review with the tour staff to ascertain whether there were any line items performing poorly against the master tour plan; (4) complete standard bill payment cycles and interaction with the road staff; (5) conduct "budget versus actual" reviews on a regular basis; (6) regularly communicate and meet with Plaintiffs during the build and rehearsal process; and (7) constantly monitor of the cash burn rate for each tour.

64.     Up to and including at least September 2010, Defendants continuously breached their duties to Plaintiffs and failed to exercise the proper degree of skill, prudence, and diligence required by members of the accounting and business management professions by, among other things: constructing and executing an engagement letter which created a complex joint venture

business relationship with Fenty, without having the arrangement negotiated and drafted by Fenty's independent financial and legal professionals; constructing and executing an engagement letter utilizing a fee provision which was unclear and lacked standard financial terms and conditions; creating a conflict of interest with regard to payment of Berdon's fees on a gross basis, while Plaintiffs lost money on touring; forming entities to manage Fenty's various enterprises (such as Tourihanna), cash flow and expenses without regard for tax consequences, resulting in unnecessary losses; directing those entities to make inter-company loans to cover expenses without proper accounting; failing to implement proper mechanisms for obtaining Fenty's approval of expenses, as well as standard financial controls with regard to employment of Fenty's capital, including disbursements, safeguarding of capital and reliability of information received while on tour; failing to maintain a proper and complete set of detailed accounting records for Fenty personally and for each business entity, including Tourihanna; failing to ensure creation of a proper and thorough budget for Plaintiffs' last tour and failing to reconcile tour expenses upon its completion; failing to participate in formulation of a master tour plan or meet with Plaintiffs' touring agent; failing to be involved in the negotiation of any of the deals with creative teams and suppliers for Plaintiffs' tours or hiring of any tour personnel; failing to implement controls for vendor bids and contracting on tours; failing to meet with Plaintiffs and explain that the tour production that was being built could lead to heavy losses and a lack of ability to cover tour expenses; failing to caution Plaintiffs regarding the serious negative impact of a tour that had become unprofitable; failing to work on any early development of tour business plans; failing to hold any substantive meetings with Plaintiffs' production manager or other key personnel; failing to implement policies regarding spending, authorization or reporting practices with respect to Plaintiffs' tours; failing to implement a formal review process for daily tour

spending; failing to take a proactive approach in tracking tour income; failing to review petty

cash and credit card expenditures on tour; failing to attempt intervention at a point when it was

clear that the "Last Girl on Earth" tour would suffer a shortfall without means to cover the debt;

failing to conduct leg by leg accounting of tours; failing to implement any bid process for tour

personnel; failing to communicate with Plaintiffs' tour agent regarding routing, deposit

processes, settlement issues, deal sheet issues or potential revenue impact items; failing to

conduct complete review of budgets during the build and early stages of tour rehearsal; failing to

conduct live time and active accounting or reporting during the tour; failing to review hotel

budgets, flight costs, class of travel, car services, etc.; failing to sufficiently or consistently

discuss the state of Plaintiffs' finances or advise Fenty as to any long term wealth management

planning; failing to counsel and advise Fenty against purchasing the Property, which was

inadvisable at that time due to the touring losses Defendants hid from Plaintiffs, which

Defendants' hid from Plaintiffs; failing to uncover millions of dollars in unpaid royalties; and

mishandling Fenty's foreign and domestic tax withholdings and payment, leading to significant

losses of tax benefits and/or savings.

     65.    As a direct and proximate result of the negligence of Berdon, Plaintiffs suffered

damages in the form of millions of dollars in ill-gotten commissions paid to Defendants and tens

of millions of dollars in lost revenues and profits, with the total amount to be proven at trial.

     **WHEREFORE**, Plaintiffs pray for judgment as hereafter set forth.

### THIRD CLAIM FOR RELIEF
### BREACH OF FIDUCIARY DUTY
**(Against Berdon, Mitnick and Gounis)**

     66.    Plaintiffs incorporate and re-allege paragraphs 1 through 64, above, as though set

forth in full herein.

     67.    As Plaintiffs' accountants and business managers, a fiduciary relationship of trust

and confidence existed between Plaintiffs and Defendants pursuant to which Plaintiffs

reasonably placed Defendants in a position of higher trust and confidence to act with all requisite

skill, care and loyalty.  This was especially true of Fenty, who at the time she hired Defendants,

was a young musician just starting out in the entertainment business.  At all relevant times,

Plaintiffs reasonably relied upon Defendants' superior knowledge and expertise, and trusted that

Defendants would conduct themselves in the best interests of Plaintiffs and not in their own self

interest.  As a result, Plaintiffs were dependent upon and vulnerable to the actions of Defendants.

68.     In particular, accounting and business management industry standards required

Defendants to, among other things:  (1) ensure that the financial arrangement between

Defendants and Fenty was free of conflicts of interest and was adequately constructed and

professional reviewed by Fenty's independent representatives; and (2) provide, on a monthly

basis, comprehensive written reports to Plaintiffs regarding their financial condition.

69.     As a result of the fiduciary relationship between Defendants and Plaintiffs,

Defendants owed Plaintiffs a duty of loyalty and good faith.  Accordingly, Defendants had an

affirmative fiduciary obligation to refrain from self-dealing and to act in the best interests of

Plaintiffs.

70.     Up to and including at least September 2010, Defendants continuously violated

the fiduciary duties it owed to Plaintiffs, including its duties of loyalty, good faith, candor, due

care and independence by, among other breaches: constructing and executing an engagement

letter which created a complex joint venture business relationship with Fenty despite her limited

financial acumen, without having the arrangement negotiated and drafted by Fenty's independent

financial and legal professionals; constructing and executing an engagement letter utilizing a fee

provision which was unclear and lacked standard financial terms and conditions; creating a

conflict of interest with regard to payment of Defendants' fees on a gross basis, while Plaintiffs lost money on touring; engaging in self-dealing by paying exorbitant commissions and fees to itself, totaling millions of dollars over a five year period and despite a clear conflict of interest inherent in the financial arrangement between Berdon and Fenty; paying millions of dollars in fees, commissions and expenses to third parties without any written representation agreement or approvals from Fenty; failing to inform Fenty that her net income from her recording and endorsements were very profitable, while her net income from touring was not financially rewarding; failing to sufficiently and consistently communicate with Plaintiffs regarding their current financial state or advising Fenty of any long term wealth management planning; failing to implement sufficient large-scale mechanisms for obtaining Fenty's approval of expenses, as well as standard financial controls; failing to ensure creation of a proper budget for Plaintiffs' "Last Girl on Earth" tour and failing to sufficiently reconcile tour expenses or put Tourihanna's books in order upon the tour's completion; failing to counsel and advise Fenty against purchasing the Property, which was inadvisable at the time of the purchase due to the touring losses, then unbeknownst to Plaintiffs; failing to uncover millions of dollars in unpaid royalties and failing to track endorsement income; and mishandling Fenty's foreign and domestic tax withholdings and payment, leading to significant losses of tax benefits and/or savings.

71.    As direct and proximate result of Defendants' breaches of its fiduciary duties, Plaintiffs have suffered damages in the form of tens of millions of dollars in lost revenues and profits, with the total amount to be proven at trial.

**WHEREFORE**, Plaintiffs pray for judgment as hereafter set forth.

### FOURTH CLAIM FOR RELIEF
### FRAUD
**(Against Berdon, Mitnick and Gounis)**

72.    Plaintiffs incorporate and re-allege paragraphs 1 through 71, above, as though set

forth in full herein.

73.    From 2005 through 2010, Berdon employees Mitnick and Gounis, acting pursuant to their authority to speak on behalf of Berdon, failed to disclose to Plaintiffs material facts regarding the true state of their finances and misrepresented information to Fenty regarding her personal financial position.  The knowing suppression of facts and misrepresentations regarding the true state of Plaintiffs' finances was intended to and did mislead Plaintiffs because Plaintiffs exclusively relied upon Defendants to counsel and advise them in their financial affairs, a fact known to Defendants.

74.    In particular, Defendants made the following material misstatements to and omissions to Plaintiffs, among hundreds of other misrepresentations and material omissions:

(a) On or about March 9, 2009, Mitnick told Fenty in an email communication that a purchasing a home in Los Angeles "would be a good investment" for Fenty at that time.  Plaintiffs are informed and believes, and on that basis alleges, that this statement was false and/or contained material omissions, in that purchasing a new home at that time was inadvisable because of the then hidden losses from the "Last Girl" tour occasioned by Defendants' financial mismanagement, and in that Mitnick, acting pursuant to his authority to speak on behalf of Berdon, failed to explain the true nature of her financial situation at that time.  Plaintiffs are further informed and believe, and on that basis allege, that Mitnick knew the falsity of his statement and made the statement with the intent that Fenty to rely thereon.

(b) On or about June 29, 2009, Mitnick told Fenty, through her personal management that Fenty could afford to spend a certain amount on a new home in Los Angeles.  On July 14, 2009, Mitnick again stated that the purchase price offered as of that date "would appear to be a good value" for Fenty.  Plaintiffs are informed and believe, and on that basis

allege, that these statements were false and/or contained material omissions, in that purchasing a

home at that time was inadvisable because of the then hidden losses from the "Last Girl" tour

occasioned by Defendants' financial mismanagement, and in that Mitnick, acting pursuant to his

authority to speak on behalf of Berdon, failed to explain the true nature of her financial situation

at that time.  Plaintiffs are further informed and believe, and on that basis allege that Mitnick

knew the falsity of his statements and made the statements with the intent that Fenty rely

thereon.

          (c)  On or about July 31, 2009, when Fenty signed the Residential Purchase

Agreement in connection with the Property, Mitnick and Gounis failed to disclose to Fenty that

purchasing a new home at the tentative purchase price of the Property was inadvisable at the time

because of the then hidden losses from the "Last Girl" tour occasioned by Defendants' financial

mismanagement.  Plaintiffs are informed and believe, and on that basis allege, that Mitnick and

Gounis, acting pursuant to their authority to speak on behalf of Berdon, failed to sufficiently

explain the true nature of Fenty's financial situation at that time.

          (d)  On or about August 26, 2009, when escrow closed on the Property,

Mitnick and Gounis failed to disclose to Fenty that purchasing the Property at the final purchase

price was inadvisable at that time because of the then hidden losses from the "Last Girl" tour

occasioned by Defendants' financial mismanagement.  Plaintiffs are informed and believe, and

on that basis allege, that Mitnick and Gounis, acting pursuant to their authority to speak on

behalf of Berdon, failed to sufficiently explain the true nature of Fenty's financial situation at

that time.

          (e)  On or about January 25, 2009, when the "Last Girl on Earth" tour

commenced, Mitnick and Gounis failed to disclose to Plaintiffs material information regarding

the budget for the tour and the potential impact of the tour as planned on Plaintiffs' finances. Plaintiffs are informed and believe, and on that basis allege, that Mitnick and Gounis, acting pursuant to their authority to speak on behalf of Berdon, failed to sufficiently explain the true nature of their financial situation at that time.

(f)  On or about August 31, 2010, toward the end of the "Last Girl on Earth" tour and prior to Fenty's termination of Berdon, Mitnick and Gounis failed to disclose to Plaintiffs and hid material information regarding the losses suffered on the tour and the impact of the tour losses on Plaintiffs, including Fenty's personal, finances.  Plaintiffs are informed and believe, and on that basis allege, that Mitnick and Gounis, acting pursuant to their authority to speak on behalf of Berdon, failed to sufficiently explain the true nature of their financial situation at that time.

75.    As a result of Plaintiffs' fiduciary relationship with, and near total dependence upon, each of the Defendants, Plaintiffs were unable to discover the extent of Defendants' misrepresentations, omissions and failures to disclose material information to them.  Plaintiffs did not discover Defendants' misrepresentation, omissions and failures to disclose until not earlier than September 2010.

76.    The continuous misrepresentations, failures to disclose information and suppressions of information herein alleged to have been made by Mitnick and Gounis, acting pursuant to their authority to speak on behalf of Berdon, were made with the intent to induce Plaintiffs to act in the manner herein alleged in reliance thereon so that they could conceal their negligence and wrongdoing and continue to obtain exorbitant commissions from Fenty.

77.    Plaintiffs, at the time these misrepresentations, failures to disclose and suppressions of facts occurred, were ignorant of the existence of the facts that Mitnick and

Gounis, acting pursuant to their authority to speak on behalf of Berdon, misrepresented, suppressed and failed to disclose.  Had Plaintiffs been aware of the existence of the facts misrepresented and/or not disclosed by Mitnick and Gounis, Plaintiffs would not have, as they did, continued to incur excess expenses and would have taken further action to monitor and reduce her expenses including, but not limited to, termination of Berdon.

78.      In reliance on these failures to disclose and suppressions of facts alleged herein, Plaintiffs were induced to and did continue to incur excessive and unnecessary touring expenses, have little or no financial controls in place on tour, conduct an unprofitable tour and Fenty did purchase the Property. Plaintiffs' reliance was reasonable because Plaintiffs placed Defendants, and each of them, in a position of trust and loyalty with respect to management of their finances and, as a result, Plaintiffs were dependent upon and vulnerable to the actions of Defendants in connection with their finances.

79.      As a proximate result of the fraudulent conduct of Berdon, Mitnick and Gounis, and each of them, as herein alleged, Plaintiffs have suffered damages in the form of tens of millions of dollars in lost revenues and profits, with the total amount to be proven at trial.

80.      Berdon, Mitnick and Gounis, in doing the things herein alleged, acted intentionally, willfully and with malice, oppression and fraud and Plaintiffs, therefore, are entitled to an award of exemplary and punitive damages against them in such amount as will adequately punish them and set an example so as to deter them and others from acting as alleged herein.

WHEREFORE, Plaintiffs pray for judgment as hereafter set forth.

### FIFTH CLAIM FOR RELIEF
### VIOLATION OF NEW YORK GEN. BUS. LAW § 349
### (Against Berdon, Mitnick and Gounis)

81.      Plaintiffs incorporate and re-allege paragraphs 1 through 80, above, as though set

– 31 –

forth in full herein.

82.    New York's General Business Law § 349 prohibits "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service" in the State of New York.

83.    Based on the foregoing instances of wrongful conduct, Defendants continuously violated General Business Law § 349, up to and including at least September 2010, and Plaintiffs have suffered damages resulting therefrom.

84.    Defendants' actions adversely affect the general public because, among other reasons, Plaintiffs are informed and believe, and on that basis allege, that Defendants have engaged, and continue to engage, in these unfair or unlawful business practices in their dealings with other artists and musicians, including, but not limited to, recording artist Yngwie Malmsteen, to whom they also provided accounting and business management services in a negligent and wrongful manner.  Defendants, and each of them, have acquired money or property rightfully belonging to Plaintiffs by engaging in such unfair business practices, thereby inducing and causing Plaintiffs to suffer injury in fact in that Plaintiffs have lost money or property as a result of such unfair acts in the form of millions of dollars in commissions paid to Berdon, in violation of the Act, including but not necessarily limited to, Business & Professions Code section 17200.

    **WHEREFORE**, Plaintiffs pray for judgment as hereafter set forth.

**SIXTH CLAIM FOR RELIEF**
**VIOLATION OF BUSINESS & PROFESSIONS CODE §§ 17200, _et seq._**
**(Against Berdon, Mitnick and Gounis)**

85.     Plaintiffs incorporate and re-allege paragraphs 1 through 84, above, as though set forth in full herein.

86.     California Business and Professions Code § 17200 prohibits unfair competition in the form of any unlawful, unfair or fraudulent business act or practice.

87.     Business and Professions Code Section 17203 allows "orders or judgments . . . as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition."

88.     Business and Professions Code Section 17204 allows "any person who has suffered injury in fact and has lost money or property as a result of such unfair competition" to bring suit for unfair competition.

89.     Plaintiffs are informed and believe, and on that basis allege, that Berdon, Mitnick and Gounis, and each of them, in doing the acts alleged herein, have engaged in unfair and or unlawful business practices.  Plaintiffs are further informed and believe, and on that basis allege, that Defendants have engaged, and continue to engage, in these unfair or unlawful business practices in their dealings with other artists and musicians, including, but not limited to, recording artist Yngwie Malmsteen, to whom they also provided accounting and business management services in a negligent and wrongful manner.  Defendants, and each of them, have acquired money or property rightfully belonging to Plaintiffs by engaging in such unfair business practices, thereby inducing and causing Plaintiffs to suffer injury in fact in that Plaintiffs have lost money or property as a result of such unfair acts in the form of millions of dollars in commissions paid to Berdon, in violation of the Act, including but not necessarily limited to, Business & Professions Code section 17200.

– 33 –

90.     To date, as a direct and proximate result of the above-referenced acts of Defendants, and each of them, Plaintiffs sustained injury in fact and lost money or property as a result of such unfair acts, in the form of millions of dollars in commissions paid to Berdon, and is therefore entitled to restitution of money lost.

91.     Pursuant to Business and Professions Code Sections 17203, 17204 and 17208, Plaintiffs are entitled to recover all amounts by which Defendants have been unjustly enriched from their unlawful, unfair, and fraudulent business acts and practices of unfair competition at Plaintiffs' expense in the form of restitution, in an amount to be proven at trial.

92.     An order requiring Defendants to disgorge all of their ill-gotten commissions, and all of the profits and gains they have reaped and restore such profits and gains to Plaintiffs which were unlawfully taken by Defendants, according to proof, should be granted, as well as Plaintiffs' reasonable attorneys' fees and costs.

WHEREFORE, Plaintiffs pray for judgment as hereafter set forth.

<u>SEVENTH CLAIM FOR RELIEF</u>
**UNJUST ENRICHMENT**
**(Against Berdon, Mitnick and Gounis)**

93.     Plaintiffs incorporate and re-allege paragraphs 1 through 92, above, as though set forth in full herein.

94.     Fenty paid Berdon undeserved commissions for their negligently-provided services pursuant to a financial arrangement implemented by Berdon which created a clear conflict of interest between Berdon and Fenty.  Fenty's payment of said commissions to Berdon led to Defendants' unjust enrichment.

95.     Plaintiffs are informed and believe, and on that basis allege, that as a result of Defendants' wrongful and unlawful conduct and their unjust enrichment at Plaintiffs' expense, Defendants, and each of them, owe restitution and the disgorgement of their ill-gotten gains, in a

total amount to be proven at trial.

 **WHEREFORE**, Plaintiffs pray for judgment as hereafter set forth.

<u>**PRAYER FOR RELIEF**</u>

 **WHEREFORE**, Plaintiffs pray for judgment as follows:

 1. On Plaintiffs' First Claim for Relief (Breach of Contract Against Berdon, Mitnick and Gounis): for compensatory damages according to proof at trial;

 2. On Plaintiffs' Second Claim for Relief (Professional Negligence Against Berdon, Mitnick and Gounis): for general damages and loss of earnings according to proof at trial;

 3. On Plaintiffs' Third Claim for Relief (Breach of Fiduciary Duty Against Berdon, Mitnick and Gounis): for general damages according to proof at trial;

 4. On Plaintiffs' Fourth Claim for Relief (Fraud Against Berdon, Mitnick and Gounis): for general damages according to proof at trial, and exemplary and punitive damages pursuant to California Civil Code section 3294;

 5. On Plaintiffs' Fifth Claim for Relief (Violation of New York Gen. Bus. L. § 349 Against Berdon, Mitnick and Gounis): for disgorgement and restitution of all Defendants' ill-gotten gains;

 6. On Plaintiffs' Sixth Claim for Relief (Violation of Business and Professions Code §17200, *et seq*. against Berdon, Mitnick and Gounis): for disgorgement and restitution of all Defendants' ill-gotten gains;

 7. On Plaintiffs' Seventh Claim for Relief (Unjust Enrichment): for restitution in a total amount according to proof at trial;

 8. For interest on Plaintiffs' damages at the maximum rate allowed by law;

 9. For attorneys' fees as provided by law;

– 35 –

10.    For costs of suit herein; and

11.    For such other and further relief as the Court deems just and proper

DATED:  July 3, 2012                                REED SMITH LLP


                                         By:_____/s/ Cindy Schmitt Minniti_____
                                              Cindy Schmitt Minniti (CS6626)
                                              Meagan E. Crowley (MC5036)
                                              599 Lexington Avenue
                                              New York, NY 10022
                                              Tel:  (212) 521-5400
                                              Fax:  (212) 521-5400
                                              cminniti@reedsmith.com

                                              Miles M. Cooley (*pro hac vice pending*)
                                              Stuart A. Shanus (*pro hac vice pending*)
                                              Reed Smith LLP
                                              1901 Avenue of the Stars, Suite 700
                                              Los Angeles, CA 90067
                                              Tel:  (310) 734-5256
                                              Fax:  (310) 734-5299

                                              *Attorneys for Plaintiffs*
                                              *Robyn Fenty and Tourihanna LLC*